**ATLANTIC COAST LINE RAILROAD COMPANY, Appellant,**

v.

**Albert Gregor KAMMERER, Appellee.**

No. 14993.

United States Court of Appeals, Fifth Circuit.

Jan. 7, 1955.

Chris B. Conyers, Brunswick, Ga., Allyn M. Wallace, Savannah, Ga., Gowen, Conyers, Fendig & Dickey, Brunswick, Ga., for appellant.

E. Way Highsmith, Brunswick, Ga., J. H. Highsmith, Brunswick, Ga., Highsmith & Highsmith, Brunswick, Ga., and Baxley, Ga., of counsel, for appellee.

Before HUTCHESON, Chief Judge, and HOLMES and RUSSELL, Circuit Judges.

HOLMES, Circuit Judge.

This is the second appearance of this case before us on appeal. The prior judgment was reversed because of the error of the court below in refusing to give certain instructions requested on behalf of the defendant. 5 Cir., 205 F.2d 525. We adhere to our ruling on the former appeal that this is not a case for punitive damages, and that the real question as to liability is one of comparative negligence. We also adhere to what was said in our former opinion about the impropriety of allowing an opening statement by counsel to be converted into a lengthy argument on the merits of the case, which tends to create such an atmosphere of bias or prejudice in the court room as to render it difficult for the jury to listen to the evidence with an open mind.

This action was instituted under the wrongful death statute of Georgia; it involves a grade crossing accident, occurring about 1:30 A. M. in Brunswick, Georgia, which resulted in the death of appellee's son, who drove his automobile into the side of a train that was occupying the crossing on a clear night with the moon, almost ready to set, shining through the large oak trees. In his opening statement to the jury, the plaintiff's attorney did not confine himself to a simple statement of the issues presented by the pleadings, or to the facts that he intended to prove by the witnesses, but he went further and made an inflammatory speech to the jury upon the merits of the case, discussing both the law and the facts in strong language and stating facts that would be clearly inadmissible in evidence. This purported opening statement began on page 132 and ended on page 169 of the printed record. The opening statement on behalf of the defendant covered almost exactly 3 pages.

It would be hard to overstate the prejudicial effect of this method of trying a lawsuit. There was no surviving eye witness to this terrible accident. The deceased was travelling alone, and there were no cars behind him. There were five members of the train crew: conductor, fireman, engineer, and two flagmen; but none of these saw the automobile before the accident, except the fireman testified that he got a glimpse of it just before the crash.

After the jurors were accepted, sworn, and impaneled, to sit as impartial triers of the facts, they were required to listen to a lenghty speech upon the alleged law and the facts of the case, the former not given them by the court and the latter not testified to by any witness. The plaintiff's attorney read from Georgia statutes as to the full value of a child's life that had been snuffed out by the inexcusable negligence of the defendant. The point he allegedly wished to bring to the jury's attention was that a penalty was imposed upon a person who caused the death of another by negligence. He said: "The penalty goes to the person who is authorized to sue for the negligent homicide. It is penal in that the measure of the recovery is the full value of the life of the deceased, irrespective of its real value to the person in whom the cause of action is vested."

Then followed an argument between counsel, interspersed with interrogatories by the court, as to whether the plaintiff was suing under the old law or the new one. The plaintiff's attorney said there was a question in his mind whether it was the same law or not. He did not want the court to rule on it now; it might not come up. Finally, the plaintiff's attorney said: "If your Honor please, I am trying to tell this jury that we are going to prove to them beyond any peradventure of doubt that this young man was killed by the most inexcusable negligence that they have ever experienced in the Court House. We are going to prove that." This statement

was objected to as highly argumentative and prejudicial, and the objection was overruled. The court also refused to declare a mistrial, as requested by the defendant. The attorney for the plaintiff then continued as follows:

"As I was about to say to you, gentlemen, we expect to show to you by overwhelming evidence in this case that this young man was 24 years old, just a young man, and was living with his *invalid* father * * * that he was one of the most promising and finest young men in the City of Brunswick * * * that the life of that young man was snuffed out in the twinkling of an eye. * * * Now, Mr. Conyers has already started to objecting * * *, I have no prejudice or bias against the railroad. I have been counsel for the Southern Railroad myself."

The court sustained the objection to the above, and plaintiff's attorney said: "If he is not going to let me say anything, suppose I just read the plaintiff's petition." But he did not do that. He said: "All right, your Honor. I don't want anything in this record this time. I want to do anything and everything Mr. Conyers wants me to do. You will see that map later, Gentlemen. Anyway, gentlemen of the jury, this young man was driving his friend's automobile that morning to pick up his sweetheart, who worked in a restaurant in Arco, and who got off at 2 o'clock." Then he went on to tell that young Kammerer was very much in love with her and would go out every morning to take her home, going into unnecessary details, stating matters not admissible in evidence. Sometimes he appeared to be testifying as to facts within his own knowledge; and, when objection was made, sometimes the court would sustain the objection, but generally it would hold that if he was going to introduce evidence to prove the facts stated, he could tell it in his opening statement. Then would follow a torrent of words, which cover pages in the record, about this fine young man who was "absolutely sober on this occasion" and who "drove that car just as straight as he could go between the front of the engine and a box car that was hitched on to the front of the engine."

"In other words," he said, "the railroad had parked this engine with a box car in front of it in line of his vision, and the boy without ever putting on any brakes * * * drove that car just as straight as a martin to his goal right into what we will contend was a death trip." The attorney told the jury in no uncertain terms whether or not this young man was sober, saying: "Now, he was absolutely sober on this occasion." Then followed several pages of argument upon the negligence of the railroad and its employees, winding up with a plea to the jury to give this case the most careful consideration, because "the only reason they give us is that this boy was running too fast." The opening statement was about one-third over at this time, and counsel seemed to shift his role from attorney to witness. He said:

"Mr. Kammerer and I went out to the same place 29 nights later when the almanac showed that the moon was exactly in the same phase it was the night this boy was killed. He [we] went out there to see just what the situation was. We knew there had to be something very unusual out there, or the boy would have put on his brakes at the last minute. Something was wrong because he never saw that train. There were no skid marks of any kind. He just went right straight into that train. We took a group of men, two policemen any [and] two or three other men out there to see what was the trouble and we found it.

"Now, the railroad, the conductor and the engineer admit that they knew that thing existed out there but did not take any kind of precaution that would protect the public against it.

"Now, here is what happened, what the situation was; that crossing, as the pictures will show you, is completely overhung with a low hanging oak tree branches that came right down to the height of a box car—came right down to the height of the box car. It was dark out there. It was almost a forest you might call it. This track comes out of a sort-of a jungle on to this street, and this engine was sticking out about three feet over on the paved part of Albany street. The old oak tree over-hangs it there. It over-hangs the only old sign there. They do not pretend to have a regular crossing sign. They just have one of these old basket ball washed out signs. They don't pretend to have a regular legal crossing sign, although it is the law of Georgia to have it."

All this arguing and witnessing continued until another objection was raised and the court had not heard exactly what was said by the plaintiff's attorney. No wonder the court "didn't catch just exactly what was said"; but we cannot presume that the jurors failed to catch it. The attorney then begun to read the pleadings, which are of a character that Stephen on Pleading calls an endless wrangle on the record. He would read a while and talk a while, interspersing any argument that occurred to him. With an air of patience and generosity, he brushed aside all objections of opposing counsel, all the mild admonitions of the court, and continued in the same tenor to the end of his opening statement. After a brief statement of what he expected to prove, the attorney for the defendant renewed his motion for a mistrial, which the court overruled, saying: "I admonished the jury not to consider anything counsel said unless it was what he intended to prove by relevant and competent evidence." At this point the proceedings were adjourned, and the jury excused, until 10 o'clock the next morning, not a line of evidence having been introduced but the minds of the jurors having been filled with unsifted facts as to the alleged negligent death of this man.

In Maryland Casualty Co. v. Reid, 5 Cir., 76 F.2d 30, 33, Judge Hutcheson says that it is the duty of a judge not to let the trial of a lawsuit get out of bounds, and that is exactly what happened in this case. Too much of the trial took place out of bounds. If an objection was made to one of his questions, the attorney for the plaintiff would often withdraw it; but the damage was done by merely asking the question. It would be unreasonable to expect the jurors to remember the court's instructions to disregard all the things said by the plaintiff's attorney that the court had told them to disregard. In his closing argument, the attorney said to the jury: "I don't know how many boys have been killed or injured as a result of the operation of this railroad in and around Brunswick. I know of three that were killed in one car." Objection was made and motion for a mistrial made; but the court overruled the motion after instructing the jury to disregard any other accidents that might have happened in connection with this railroad. (See Appendix.)

The same attorney also repeatedly asked the jury to bring in a verdict that would shock the defendant into doing something about this operation, sometimes referring to it as this arrogant railroad company. This was both before and after he told the jury of three boys being killed in one car, "besides this one."

Too many errors infect this verdict for it to be permitted to stand. The judgment appealed from is reversed, and the cause remanded to the district court for further proceedings not inconsistent with this opinion.

Reversed.

### APPENDIX

The following is from the argument to the jury in the closing speech on be-

half of the plaintiff, pages 660 and 661 of Vol. 2 of the Record:

"Argument on behalf of the Plaintiff.

"By Mr. E. Way Highsmith: May it please the Court, and you gentlemen of the jury: I don't know whether you gentlemen read the same Bible rules or not, but I want to quote you one: 'Therefore all things whatsoever ye would that men should do to you, do ye even so to them: for this is the law and the Prophets.'

"I read that this morning to my wife and three boys. I said, 'Well I am going to take that as my text this morning before that jury.' I am going to do my best to point out to you gentlemen by simple reasoning that this railroad company not only doesn't adopt one fragment of that teaching of the lowly Nazerene, but on the contrary it seems to have a rule of conduct in its operation of its railroad in Brunswick that is directly and diametrically opposed to it, and that in my weak and humble way I am going to try to get this jury to bring in a verdict in this case that will help the people of Brunswick in some degree by making this arrogant railroad company adopt the Golden Rule in its operation of its railroad. Some of you gentlemen are from Brunswick and some of you are not, but I don't know how many boys have been killed or injured as a result of the operation of this railroad in and around Brunswick. I know of three that were killed in one car, besides this one.

"Mr. Conyers: Now, may it please the Court, I object to that statement and move for a mistrial on the basis of the statement that Mr. Highsmith has just made with reference to other deaths in Glynn County on account of the operations of the defendant's trains.

"The Court: Gentlemen of the jury, of course any other accident that might have happened in connection with the Atlantic Coast Line Railroad Company would not be admissible in this case. So, you gentlemen confine yourself to the evidence in this case, and don't consider any statement counsel made about that.

"Mr. Conyers: Does the Court overrule the motion?

"The Court: With that admonition I overrule your motion.

"Mr. Conyers: I except to Your Honor's ruling.

"The Court: All right."